UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SARAH CATHLEEN ROSENBAUER,

               Plaintiff,

      v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

<u>DECISION & ORDER</u>

12-CV-6690P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Sarah Cathleen Rosenbauer ("Rosenbauer") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 7).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 18). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Rosenbauer's motion for judgment on the pleadings is denied.

_____

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

# BACKGROUND

## I.       Procedural Background

Rosenbauer applied for DIB on December 16, 2009, alleging disability beginning

on January 9, 2010, due to back pain, migraines, manic depression and diabetes.  (Tr. 182, 184,

197-98).[2]  On July 23, 2010, the Social Security Administration denied Rosenbauer's claim for

benefits, finding that she was not disabled.  (Tr. 77-81).  Rosenbauer requested and was granted a

hearing before Administrative Law Judge Milagros Farnes (the "ALJ").  (Tr. 85-86, 88-89,

118-22).  The ALJ conducted a video conference hearing on September 29, 2011.  (Tr. 43-65).

Rosenbauer was represented at the hearing by her attorney, Kelly Laga, Esq.  (Tr. 43, 152).  In a

decision dated October 27, 2011, the ALJ found that Rosenbauer was not disabled and was not

entitled to benefits.  (Tr. 16-27).

On November 14, 2012, the Appeals Council denied Rosenbauer's request for

review of the ALJ's decision.  (Tr. 1-5).  Rosenbauer commenced this action on December 19,

2012, seeking review of the Commissioner's decision.  (Docket # 1).  Rosenbauer had previously

applied for benefits, which the Commissioner denied by final decision dated October 31, 2000.

(Tr. 184).

## II.      Non-Medical Evidence

### A.       Rosenbauer's Application for Benefits

Rosenbauer was born on October 21, 1973 and is now forty years old.  (Tr. 184).

Rosenbauer completed eighth grade in 1989 and received special education services.  (Tr. 203).

Rosenbauer reported that her symptoms include constant pain that interferes with her ability to

sit or to lie down.  (Tr. 198).  In addition, according to Rosenbauer, she suffers from disabling

---

[2]   The administrative transcript shall be referred to as "Tr. __."

migraines.  (*Id.*).  Further, Rosenbauer reported that she suffers from depression that causes her to want to stay in bed and interferes with her functioning.  (*Id.*).  According to Rosenbauer, she has experienced these symptoms since April 2004.  (*Id.*).

Rosenbauer reported that her previous work history included employment as a bus aid and cook, a cashier, a factory worker and a janitor.  (*Id.*).  At the time of her application, Rosenbauer was taking Flexeril to manage her back pain, Lantus and Metmorphin to address her diabetes, Naproxen for inflammation and Prozac for her depression.  (Tr. 202).  According to Rosenbauer, the Flexeril causes drowsiness.  (*Id.*).

**B.**     **The Disability Analyst's Assessment**

On July 23, 2010, the disability analyst, N. Bahl ("Bahl"), completed a physical residual functional capacity ("RFC") assessment.  (Tr. 70-75).  Bahl opined that Rosenbauer could occasionally lift ten pounds and frequently lift less than ten pounds.  (Tr. 71).  According to Bahl, Rosenbauer could sit for six hours during an eight-hour workday, stand for at least two hours during an eight-hour workday and was not limited in her ability to push or pull.  (*Id.*).  In addition, Bahl opined that Rosenbauer could occasionally climb ladders, ropes or scaffolds, stoop, kneel or crouch and could frequently balance and crawl.  (Tr. 72).  Finally, Bahl noted that Rosenbauer had no manipulative, visual, communicative or environmental limitations.  (Tr. 72-73).  Based upon this assessment of Rosenbauer's limitations, Bahl opined that Rosenbauer retained the ability "to perform sedentary work."  (Tr. 74).

**III.**     **Relevant Medical Evidence[3]**

Treatment notes from Strong Memorial Hospital ("Strong") indicate that Rosenbauer was injured during a motor vehicle accident in January 2002.  (Tr. 400-01).

---

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

Rosenbauer suffered a laceration to her liver and multiple rib fractures.  (*Id.*).  Rosenbauer also fractured a finger on her left hand, which was surgically repaired.  (Tr. 481-82).

On April 19, 2004, Rosenbauer was admitted to the emergency room at the Clifton Springs Hospital & Clinic ("Clifton Springs").  (Tr. 218).  Treatment notes indicate that Rosenbauer's family had called an ambulance after Rosenbauer collapsed and admitted ingesting more diabetes medication than her prescribed amount.  (*Id.*).  Rosenbauer reported experiencing despondency and anger caused by various problems in her personal life, including nightmares, the inability to speak to a close friend, domestic violence, and the fact that she had lost a radio contest that day.  (*Id.*).  According to Rosenbauer, she left the house after writing a note leaving custody of her children to her fiancé.  (*Id.*).  Rosenbauer attempted to go the mall to look for employment, but realized that she was inappropriately dressed.  (*Id.*).  She slipped and fell on the pavement, causing traffic to stop.  (*Id.*).  Rosenbauer reported suicidal and violent thoughts.  (*Id.*).  Treatment notes indicate that Rosenbauer reported a history of mental health treatment for post-traumatic stress disorder related to a history of abuse as a child.  (*Id.*).

Eileen Wegman ("Wegman"), a crisis specialist, diagnosed Rosenbauer with depressive disorder, not otherwise specified, rule out bipolar disorder and rule out post-traumatic stress disorder.  (Tr. 226).  Wegman noted that Rosenbauer suffered from suicidal ideation and homicidal ideation.  (*Id.*).  Wegman recommended an inpatient stay for further evaluation and long-term ongoing psychotherapy.  (*Id.*).

On April 20, 2004, Rosenbauer was transferred for inpatient treatment at St. Mary's Hospital.  (Tr. 655-66).  Rosenbauer reported that she had not planned to overdose on her medication.  (*Id.*).  According to Rosenbauer she was overwhelmed by ongoing personal issues, including financial stress, trouble with her housing, inability to obtain disability benefits, and an

ongoing abusive relationship with her significant other, who is the father of her four children. (*Id.*). Rosenbauer reported that all four children live with her and her fiancé. (*Id.*). Rosenbauer reported that she has attempted to work, but that she gets too anxious and has to stop. (*Id.*). According to Rosenbauer, she has had arguments with her fiancé over his refusal to help with household chores and childcare responsibilities. (*Id.*).

Rosenbauer reported that her primary care physician had prescribed Paxil for her depression and that she had been taking the medication for the past two years. (*Id.*). She reported a history of nightmares, flashbacks and poor sleep. (*Id.*). She also reported physical problems, including a herniated disc, chronic back pain, hypercholesterolemia, non-insulin dependent diabetes mellitus and migraine headaches. (*Id.*). Upon examination, Alexandra Fotiou ("Fotiou"), M.D., noted that Rosenbauer was mildly disheveled with a restricted and tearful affect and a depressed mood. (*Id.*). Her thoughts were organized, her speech was normal and she had no psychotic symptoms. (*Id.*). According to Fotiou, Rosenbauer's insight and judgment were fair. (*Id.*).

During her inpatient stay, Rosenbauer's affect brightened and her mood improved. (*Id.*). Rosenbauer denied any further suicidal ideation and stated that she wanted to return to care for her children. (*Id.*). Rosenbauer agreed to commence outpatient treatment for depression at Clifton Springs upon discharge. (*Id.*). Rosenbauer was discharged on April 22, 2004. (*Id.*). At discharge, Rosenbauer was diagnosed with major depressive disorder and assessed to have a Global Assessment of Functioning ("GAF") of 60. (*Id.*).

On April 28, 2004, Rosenbauer attended an appointment at Clifton Springs for outpatient mental health treatment. (Tr. 258). Treatment notes indicate that Rosenbauer had

been recently discharged from inpatient hospitalization after an overdose.  (*Id.*).  The treatment notes recount Rosenbauer's mental health history.  (*Id.*).

On June 2, 2004, Rosenbauer had another appointment at Clifton Springs with a psychiatric social worker.  (Tr. 259, 270-71).  Rosenbauer reported increased stress from her relationship with her fiancé, her financial situation and her disabilities.  (*Id.*).  Rosenbauer reported that she was experiencing flashbacks, increased anxiety and panic, and decreased sleep and motivation.  (*Id.*).  Treatment notes reflect that Rosenbauer cancelled or failed to arrive for appointments on April 30, May 6, May 17 and June 16, 2004.  (Tr. 271).  The notes suggest that Rosenbauer relocated to Rochester, New York.  (*Id.*).

On September 1, 2004, Rosenbauer went to the Geneva General Hospital complaining of pain in her left ankle.  (Tr. 279).  Rosenbauer reported that she injured her ankle while walking.  (*Id.*).  Upon examination, Rosenbauer was walking with a limp and her ankle was swollen and tender.  (*Id.*).  An x-ray revealed no evidence of any acute fractures, although it revealed a potential old fracture deformity of the lateral malleolus.  (Tr. 280).  Rosenbauer was prescribed an air cast and crutches.  (Tr. 279).

On January 17, 2005, Rosenbauer met with Aubree Guiffre ("Guiffre"), M.S. M.F.T., an assessment therapist.  (Tr. 296).  The purpose of the visit was for Rosenbauer to be evaluated in connection with an ongoing custody dispute with her ex-partner.  (*Id.*).  During the interview, Rosenbauer denied any symptoms consistent with a mood or thought disorder or anxiety.  (*Id.*).  Guiffre opined that Rosenbauer did "not meet the criteria for a mental health diagnosis and mental health treatment [was] not being recommended."  (*Id.*).

At the time of the interview, Rosenbauer reported that she was living with her husband, whom she married in July 2004, and that she was eight months pregnant.  (Tr. 297-99).

6

She had sought a mental health evaluation upon the advice of her attorney relating to an

upcoming custody hearing. (Tr. 297-98). Rosenbauer reported that in June 2004, she ended a

thirteen-year abusive relationship with her former partner, the father of her four children. (Tr.

298). According to Rosenbauer, her former partner had been physically abusive towards her and

she had obtained an order of protection prohibiting him from contacting her. (*Id.*). Rosenbauer

told Guiffre that she had attempted suicide in April 2004 because she felt "trapped" in her

previous relationship. (*Id.*). Rosenbauer denied any current mental health symptoms and denied

that she needed mental health treatment. (*Id.*). Rosenbauer reported that she had stopped

working in July 2003 because of "family stress." (Tr. 299).

Rosenbauer reported that her mood was "better than ever" and denied problems

with sleep, appetite, energy, motivation, concentration or memory. (Tr. 301). Upon

examination, Guiffre noted that Rosenbauer's speech was normal, articulate and coherent and

that she displayed coherent, attentive and logical thought process. (Tr. 300). Guiffre did not

observe any physical symptoms associated with anxiety or depression and opined that

Rosenbauer's affect was stable, full range and appropriate to content. (*Id.*). Further,

Rosenbauer's insight and judgment were good. (*Id.*). Guiffre deferred diagnosis on Axis I and

assessed Rosenbauer's GAF to be 65. (Tr. 301).

Between May and September 2006, Rosenbauer received treatment from the

Women's Health Practice at Strong. (Tr. 314-26). During those appointments, Rosenbauer

reported that she had not been receiving any treatment for her diabetes for the previous two

years. (Tr. 319, 324). Rosenbauer reported a history of depression and a suicide attempt related

to a previous abusive relationship, but indicated that she had "never been happier" since

marrying her husband and denied any depressive symptoms. (Tr. 315, 324-25). Rosenbauer also

reported a history of migraines, for which she was prescribed Fioricet in July 2006 and which provided her relief.  (Tr. 324).

On January 26, 2007, Rosenbauer had an appointment at the internal medicine department at Strong to establish a primary care provider.  (Tr. 418, 580-81).  During that visit, she was examined by Ryan Hoefen ("Hoefen"), M.D.  (*Id.*).  At the time of her visit, Rosenbauer reported that she was five months pregnant and was controlling her diabetes with insulin due to her pregnancy.  (*Id.*).  Rosenbauer reported continuing to smoke up to one pack of cigarettes per day, and Hoefen strongly advised her to discontinue smoking.  (*Id.*).  Rosenbauer had a follow-up appointment with Hoefen on March 2, 2007.  (Tr. 582-83).

On June 1, 2007, Rosenbauer met with Hoefen complaining of back pain.  (Tr. 584).  According to Rosenbauer, in 1995 she had been diagnosed with a disc herniation as a result of an MRI.  (*Id.*).  Since that time, Rosenbauer reported experiencing periods of excruciating back pain approximately three times per year.  (*Id.*).  According to Rosenbauer, the pain radiates down her back and both of her legs.  (*Id.*).  Rosenbauer reported that in the past she had received treatment at the emergency room for her back pain and that the pain was alleviated through the use of Naproxen, Percocet and Flexeril.  (*Id.*).  Rosenbauer also reported that since giving birth in April 2007, she had been prescribed Metformin and Glyburide to control her diabetes.  (*Id.*).  Hoefen prescribed Naproxen and Flexeril to address Rosenbauer's back pain and recommended that she perform back exercises and stretches to avoid any future flare-up of her back pain.  (Tr. 585).  In addition, Hoefen indicated that if her pain continued, they could discuss a referral for physical therapy or injections.  (*Id.*).

On April 28, 2008, Rosenbauer had an appointment with Michael Ferrantino ("Ferrantino"), M.D., at Strong.  (Tr. 587).  Rosenbauer reported that she had recently gone to

the emergency room after experiencing pain in her left shoulder for several days.  (Tr. 587-88).

She described the pain as "sharp and stabbing" with occasional radiation to her elbow.  (*Id.*).

According to Rosenbauer, the pain worsened with movement.  (*Id.*).  At the emergency room, an

x-ray of her shoulder was taken.  (*Id.*).  The x-ray revealed no fracture, dislocation or joint

abnormalities, but revealed possible calcific tendinitis.  (Tr. 343, 587).  Rosenbauer reported that

she had been taking her husband's Percocet to manage the pain.  (Tr. 587).  Ferrantino assessed

that the pain was likely caused by rotator cuff tendinitis, a minor tear or frozen shoulder.  (Tr.

588).  He prescribed Ibuprofen and recommended that Rosenbauer perform range of motion

exercises.  (*Id.*).

       On May 22, 2008, Rosenbauer went to the emergency room at Strong

complaining of a migraine headache.  (Tr. 346-47).  She was prescribed Vicodin and advised to

schedule an appointment for re-evaluation the following week.  (*Id.*).

       On June 23, 2008, Rosenbauer visited with Hoefen complaining of back pain.

(Tr. 586).  Hoefen noted that Rosenbauer had a history of periodic back pain that was managed

by Ibuprofen and Flexeril.  (*Id.*).  He also noted that he had avoided prescribing pain medication

because Rosenbauer's husband was also a clinic patient and had exhibited drug-seeking

behavior.  (*Id.*).

       On November 20, 2008, Rosenbauer had an appointment with Melissa

Gunasekera ("Gunasekera"), M.D., at Strong.  (Tr. 589-90).  During the appointment,

Rosenbauer complained of left leg pain that she described as a sharp pain radiating from her left

hip down to her foot.  (*Id.*).  Rosenbauer reported that the pain was "excruciating" and that it was

only relieved with Percocet, Flexeril and Naproxen, which she had obtained from her husband

who is on disability.  (*Id.*).  According to Rosenbauer, the pain had gotten worse over the course

of the previous months, and she had visited the emergency room on November 14, 2008 due to the pain.  (*Id.*).  At the emergency room she was given Naproxen and Flexeril, but no x-rays were taken.  (*Id.*).  Rosenbauer explained that she previously had been diagnosed with a herniated disc in her back and that she was taking Naproxen and Flexeril to manage her pain.  (*Id.*).  Both Rosenbauer and her husband requested pain medication.  (*Id.*).  Upon examination, Gunasekera assessed unimpressive findings after noting that Rosenbauer was able to remove her shoe from her left foot, requiring her to flex and extend her left hip, without pain or difficulty.  (*Id.*).  Gunasekera further opined that Rosenbauer and her husband were engaged in narcotic-seeking behavior, having repeatedly requested and bargained for narcotics and sleep medications.  (*Id.*).  Gunasekera advised Rosenbauer and her husband that Rosenbauer had failed to demonstrate compliance with primary care visits and that she needed to demonstrate that she had attempted previous treatment recommendations prior to exploring new treatment options, including narcotics.  (*Id.*).  Gunasekera continued the prescriptions for Flexeril and Naproxen and referred Rosenbauer to physical therapy.  (*Id.*).

In addition, Rosenbauer reported that she had discontinued her medications for diabetes during the previous sixteen months because she had issues with her insurance and had failed to keep primary care appointments.  (*Id.*).  Gunasekera advised Rosenbauer of the importance of managing her glucose and taking her diabetes medications.  (*Id.*).  Gunasekera recommended restarting Glucovance and gave Rosenbauer a glucose monitor.  (*Id.*).

On March 6, 2009, Rosenbauer had an appointment with Albert Kim ("Kim"), M.D.  (Tr. 591-92).  Rosenbauer reported that she had been monitoring her blood glucose levels, which had improved from her previous levels, but were not optimal.  (*Id.*).  Rosenbauer reported

experiencing stress due to several deaths in her family and her husband's recent hospitalization. (*Id.*). Kim encouraged Rosenbauer to improve her diet and to exercise. (*Id.*).

On July 17, 2009, Rosenbauer began receiving primary care treatment at Culver Medical Group ("Culver Medical"). (Tr. 593-95). Treatment notes indicate that Rosenbauer was receiving care at Strong internal medicine, but had switched providers because her husband had switched to Culver Medical. (*Id.*). At the appointment, Rosenbauer's blood sugar level was at a "critical high." (*Id.*). Rosenbauer reported that she had been taking Glyburide/Metformin to manage her glucose levels and that she had recently increased her dosage because her levels were high. (*Id.*). Anne Huber ("Huber"), M.D., modified her diabetes prescription by discontinuing Glyburide and prescribing Lantus and Metformin. (*Id.*).

Rosenbauer's new patient report indicated that she exercised regularly by walking, playing with her kids and playing tennis. (Tr. 306). Rosenbauer reported that she experienced pain in her back, knee and shoulder. (Tr. 307). According to Rosenbauer, she had experienced intermittent back pain for several years and her shoulder had bothered her for the past four days. (*Id.*). Rosenbauer reported that her pain was exacerbated by lifting and excessive movement. (*Id.*).

Rosenbauer attended another appointment with Huber on July 29, 2009. (Tr. 596-97). Huber checked Rosenbauer's blood sugar levels and determined that they were lower. (*Id.*). Huber noted that she wanted to discuss smoking cessation and Rosenbauer's daytime sleepiness at a future appointment. (*Id.*).

On January 11, 2010, Rosenbauer attended an appointment with Huber to follow-up on her diabetes. (Tr. 599-601). Rosenbauer also raised concerns regarding her mood and insomnia. (*Id.*). According to Rosenbauer, she was experiencing difficulties sleeping due to

aches in her legs and body, and her children waking her up in the night.  (*Id.*).  Rosenbauer's

husband also reported that she snored and momentarily stops breathing during her sleep.  (*Id.*).

Rosenbauer reported that she never feels well-rested and is often tired during the day.  (*Id.*).

With respect to her mood, Rosenbauer reported a history of depression.  (*Id.*).  According to

Rosenbauer, she cries all the time and feels overwhelmed by her children.  (*Id.*).  Rosenbauer

reported that she had previously been prescribed Paxil, but it caused her to feel manic.  (*Id.*).

Rosenbauer also reported that she had tried Wellbutrin without success.  (*Id.*).  According to

Rosenbauer, she has not taken any medication to manage her mood for several years, but felt that

she should be on medication and should have individual counseling.  (*Id.*).

 Huber prescribed Fluoxetine to address Rosenbauer's depression and contacted a

social worker to establish a behavioral health therapist for Rosenbauer.  (*Id.*).  Huber opined that

Rosenbauer might suffer from sleep apnea and referred her to a sleep specialist.  (*Id.*).  Huber

also indicated that Rosenbauer needed an eye examination.  (*Id.*).

 On May 24, 2010, Rosenbauer attended another appointment with Huber.  (Tr.

602-04).  Huber monitored Rosenbauer's blood glucose levels, and Rosenbauer reported that she

was trying to eat a healthier diet and was occasionally walking for exercise.  (*Id.*).  Rosenbauer

reported continued depression with some good days and some bad days.  (*Id.*).  Rosenbauer also

reported that she had a history of migraine headaches, which she experienced approximately

twice per week.  (*Id.*).  Rosenbauer reported that she had used Fioracet in the past and that it

provided relief and that Immitrex did not relieve her symptoms.  (*Id.*).  Huber increased

Rosenbauer's dosage of Fluoxetine to attempt to bring her mood to a better level.  (*Id.*).  Huber

prescribed Naproxen with Reglan to address Rosenbauer's migraine headaches.  (*Id.*).

On July 15, 2010, state examiner Dr. Margery Baittle ("Baittle") conducted a consultative psychiatric evaluation of Rosenbauer.  (Tr. 532-35).  During the evaluation, Rosenbauer reported that she completed school through the eleventh grade in a regular class setting.  (*Id.*).  Rosenbauer told Baittle that she lives with her husband and their six children ranging in ages from sixteen to three.  (*Id.*).  Rosenbauer reported that she last worked in 2001 and could not recall why she stopped working.  (*Id.*).  According to Rosenbauer, she is currently unable to work because of her back, body pain, diabetes and depression.  (*Id.*).

Rosenbauer recounted her history of psychiatric treatment, including her hospitalization in 2004 and her subsequent outpatient treatment for a few months following that hospitalization.  (*Id.*).  Rosenbauer reported that she did not currently receive mental health treatment, but had scheduled an appointment to commence treatment in August 2010.  (*Id.*).  Rosenbauer reported that she has difficulty sleeping and has to force herself to get out of bed in the morning.  (*Id.*).  According to Rosenbauer, she suffers from crying spells, irritability, concentration problems and diminished sense of pleasure.  (*Id.*).  Rosenbauer stated that she experienced these symptoms prior to her hospitalization in 2004.  (*Id.*).  At times, according to Rosenbauer, she also experiences periods of manic symptoms, during which her mood is elevated and she is more active and easily distractible.  (*Id.*).

Rosenbauer reported that she socializes infrequently.  (*Id.*).  According to Rosenbauer, her husband and children assist her around the house.  (*Id.*).  Rosenbauer reported a good relationship with her family and that her mother and brother live upstairs.  (*Id.*).  Rosenbauer told Baittle that she enjoys sewing, quilting, watching television, listening to the radio, reading and watching her small children.  (*Id.*).

Upon examination, Baittle noted that Rosenbauer appeared somewhat disheveled. (*Id.*). Baittle opined that Rosenbauer had fluent, clear speech, coherent and goal-directed thought processes, somewhat dysphoric affect, neutral mood, clear sensorium, good orientation, and average intellectual functioning with a somewhat limited general fund of information. (*Id.*). Baittle noted that Rosenbauer's attention and concentration were mildly impaired. (*Id.*). According to Baittle, Rosenbauer could count, perform simple calculations and understand the serial three's, although she performed them incorrectly. (*Id.*). Baittle found Rosenbauer's recent and remote memory skills mildly impaired. (*Id.*). According to Baittle, Rosenbauer could recall three out of three objects immediately and two out of three objects after five minutes and she could complete five digits forward and back. (*Id.*). Baittle opined that Rosenbauer's insight and judgment were fair. (*Id.*).

According to Baittle, Rosenbauer could follow and understand simple and more complex directions, perform simple tasks independently, relate quite well with others, seemed to maintain attention and concentration, could manage her own finances and could probably make appropriate decisions, although Rosenbauer has difficulty dealing with stress. (*Id.*). According to Baittle, Rosenbauer's prognosis was fair. (*Id.*).

That same day, July 15, 2010, state examiner Karl Eurenius ("Eurenius"), M.D., conducted a consultative internal examination of Rosenbauer. (Tr. 536-41). During Eurenius's examination, Rosenbauer reported that she suffered from depression, back pain, headaches and diabetes. (*Id.*). According to Rosenbauer, she has had back pain for the past twenty years and was told that she had a "slipped disc" in 1997. (*Id.*). Rosenbauer reported that she was treated with Vicodin, Flexeril and Naprosyn, which generally alleviates the pain. (*Id.*). In addition, heat helps to alleviate the pain. (*Id.*). According to Rosenbauer, on occasion, the pain radiates from

her back into her buttocks and down her legs.  (*Id.*).  Rosenbauer reported that she has numbness and tingling in her hands and that she has a small sore on her left foot.  (*Id.*).

Rosenbauer reported that she is able to cook, clean, do the laundry and shop, but does so with difficulty because of her back pain.  (*Id.*).  Rosenbauer reported that she can shower, bathe and dress herself daily.  (*Id.*).  Rosenbauer's hobbies include watching television, reading and listening to the radio.  (*Id.*).

Upon examination, Eurenius noted that Rosenbauer did not appear to be in any distress and that her gait and stance were normal.  (*Id.*).  Rosenbauer was able to stand on her heels and toes and could squat fifty percent with pain.  (*Id.*).  Eurenius noted that Rosenbauer did not use an assistive device and did not need any assistance to change, get off the examination table or rise from the chair.  (*Id.*).

Eurenius noted that Rosenbauer's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement, and her lumbar spine had limited flexion with pain.  (*Id.*).  Rosenbauer's lumbar lateral flexion and rotation were full with pain in the low mid-back.  (*Id.*).  In addition, Eurenius noted that Rosenbauer could perform straight leg raises to thirty degrees bilaterally while standing and ninety degrees bilaterally while sitting with pain in the low mid-back.  (*Id.*).  Rosenbauer had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees and ankles.  (*Id.*).  Eurenius also noted tenderness in Rosenbauer's low, mid-back upon palpation.  (*Id.*).

Eurenius reviewed x-rays of Rosenbauer's spine.  (*Id.*).  The lumbosacral spine x-ray revealed degenerative spondylosis at L4-L5 and L5-S1 with straightening and no compression fractures.  (*Id.*).  The thoracic spine x-ray revealed mild degenerative spondylosis at T11-T12 with no compression fracture.  (*Id.*).  Eurenius opined that Rosenbauer was "moderately

limited in prolonged standing, climbing or descending more than a flight of stairs, bending, lifting, or carrying more than ten pounds, and kneeling due to chronic low back pain.  (*Id.*).

On July 22, 2010, agency medical consultant Dr. T. Harding ("Harding") completed a Psychiatric Review Technique.  (Tr. 542-55).  Harding concluded that Rosenbauer's mental impairments did not meet or equal a listed impairment.  (Tr. 545, 547).  According to Harding, Rosenbauer suffered from mild limitations in her activities of daily living and moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence or pace.  (Tr. 552).  In addition, according to Harding, there was insufficient evidence to determine whether Rosenbauer had suffered from repeated episodes of deterioration.  (*Id.*).  Harding completed a mental RFC assessment.  (Tr. 66-69).  Harding opined that Rosenbauer suffered from moderate limitations in her ability to complete a normal workday and work week without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in a work setting; and travel in unfamiliar places or use public transportation.  (Tr. 67).  According to Harding, Rosenbauer is able to perform the basic demands of competitive, renumerative unskilled work on a sustained basis.  (Tr. 68).

On September 18, 2010, Rosenbauer went to the emergency room at Strong complaining of abdominal pain.  (Tr. 560).  Rosenbauer was given pain and nausea medication and was advised to follow-up with her primary care physician.  (Tr. 562).

On November 5, 2010, Rosenbauer attended an appointment with Huber.  (Tr. 605-07).  Huber noted that Rosenbauer was not testing her blood sugar regularly and had not requested to have labs performed for a significant amount of time.  (*Id.*).  During the visit,

Rosenbauer complained of pain in the ball of her left foot that had been ongoing for the previous three months. (*Id.*). In addition, Rosenbauer reported that she continued to have issues falling and staying asleep at night and was frequently tired during the day. (*Id.*). Upon examination, Huber noted a painful callous under the ball of Rosenbauer's left foot. (*Id.*). Huber prescribed Trazadone and Naproxen to assist Rosenbauer with her sleep management and referred her to a sleep specialist. (*Id.*). Huber referred Rosenbauer to a podiatrist to treat her callous and gave her ten tablets of Tylenol with Codeine to manage her pain until she met with the podiatrist. (*Id.*). Huber noted that Rosenbauer was overdue for an ophthalmology appointment, as well as a lipid profile. (*Id.*).

On November 23, 2010, Rosenbauer presented to the emergency department at Strong complaining of ongoing pain in her left foot. (Tr. 563-64). Rosenbauer reported that she had an appointment with a podiatrist scheduled in three weeks. (*Id.*). Upon examination, a plantar wart was observed on Rosenbauer's left foot that was only painful with pressure. (*Id.*). Rosenbauer was advised to call her podiatrist and attempt to get an earlier appointment. (*Id.*). She was given a prescription for Percocet and advised to alternate between Percocet and Tylenol to manage her pain. (*Id.*).

On December 3, 2010, Rosenbauer returned to Huber to follow-up on her left foot pain. (Tr. 608-09). Rosenbauer reported that the callous on her left foot limited her mobility and that she had to take pain medication in order to complete her housework. (*Id.*). Rosenbauer was taking Naproxen and Percocet to manage her pain and had scheduled a February 1, 2011 appointment with a podiatrist. (*Id.*). Rosenbauer requested a prescription for more pain killers until her podiatrist appointment. (*Id.*). Huber advised Rosenbauer to soak and exfoliate her foot daily and to continue taking Naproxen. (*Id.*). In addition, Huber prescribed Tylenol. (*Id.*).

Rosenbauer also reported that she had ceased taking Trazadone for her insomnia and that she was doing well on melatonin.  (*Id.*).

On January 7, 2011.  (*Id.*).  Rosenbauer returned for a visit with Huber complained that the Tylenol did not provide relief for her foot pain and requested a prescription for Percocet.  (*Id.*).  According to Rosenbauer, she had received a prescription for Percocet from the emergency department when she originally sought evaluation of her left foot pain and it had alleviated her pain.  (*Id.*).  Huber gave Rosenbauer a prescription for Percocet.  (*Id.*).  With respect to Rosenbauer's diabetes, Huber noted that Rosenbauer had not yet gone for lab work and wrote her another lab slip.  (*Id.*).  Rosenbauer reported that she would undergo a sleep study on February 1, 2011.  (*Id.*).

On February 1, 2011, Rosenbauer met with a podiatrist, Robert Peel ("Peel"), D.P.M., for an evaluation of her left foot.  (Tr. 556-58).  Peel assessed a low-grade ulceration and an abscess plantar aspect on the left foot.  (*Id.*).  Peel debrieded and de-roofed the wounded area and applied a dressing which he advised Rosenbauer to change daily.  (*Id.*).

On February 10, 2011, Rosenbauer went to the emergency room complaining of back pain.  (Tr. 565).  According to Rosenbauer, she has a history of back pain and her current pain started when she attempted to lift her fifty-pound child.  (*Id.*).  Rosenbauer requested pain medication, a referral to a back specialist and a doctor's note to excuse her from her volunteer work.  (*Id.*).  An x-ray of Rosenbauer's spine revealed loss of lumbar lordosis related to a spasm or a strain, but no bony abnormality.  (Tr. 566).  Rosenbauer was given Flexeril, Vicodin and ibuprofen which alleviated her pain.  (*Id.*).  She was instructed not to lift anything heavier than ten pounds for the next week.  (*Id.*).  Rosenbauer was given a note to excuse her from her

volunteer work until February 16, 2011.  (*Id.*).  Rosenbauer was prescribed Percocet, ibuprofen and Flexeril.  (*Id.*).

On June 16, 2011, Rosenbauer returned to the emergency room complaining of left ankle pain. (Tr. 567).  Rosenbauer reported that her dog had stepped on her ankle and that she could not bear weight on her left foot.  (*Id.*).  Rosenbauer was advised to rest, ice, compress and elevate her ankle and to follow-up with her primary care physician. (Tr. 570).  She was prescribed Naproxen and Percocet for her pain.  (*Id.*).

On June 21, 2011, Rosenbauer attended an appointment with Huber.  (Tr. 613-15).  Huber's treatment notes indicate that Rosenbauer had missed several clinic visits. (*Id.*).  Rosenbauer reported that she had not been taking Metformin for her diabetes for the past two months, but was continuing to take Lantus daily.  (*Id.*).  Rosenbauer reported that she had also stopped taking Lisinopril for the previous two months.  (*Id.*).  In addition, Rosenbauer had stopped taking Fluoxetine to manage her depression during the previous six months.  (*Id.*). Rosenbauer reported that despite discontinuing her medication, her mood had improved, which she attributed to sleeping better.  (*Id.*).  According to Rosenbauer, she was using a CPAP machine and melatonin and had improved sleep.  (*Id.*).  In addition, Rosenbauer reported that she was learning how to ride a motorcycle.  (*Id.*).  Rosenbauer reported that she had had the callous removed from her left foot and it was no longer causing any problems.  (*Id.*).

On August 11, 2011, Rosenbauer went to the emergency department at Strong complaining of chest and back pain.  (Tr. 618).  She was admitted to undergo a cardiac assessment.  (Tr. 649).  Rosenbauer returned to the emergency room the following day complaining of continued back pain.  (*Id.*).  Rosenbauer was discharged on August 13, 2011 with prescriptions for Naproxen and Oxycodone to manage her pain through the weekend.  (Tr. 646).

19

She was advised to make an appointment with her primary care physician if her pain continued. (Tr. 642).

Rosenbauer met with Elizabeth Cherella ("Cherella"), M.D., at Culver Medical on August 19, 2011 complaining of upper back pain.  (Tr. 649-51).  Upon examination, Cherella noted that Rosenbauer had full range of motion for flexion and extension in her back, but that any twisting motion was limited by pain.  (Tr. 650).  Cherella recommended that Rosenbauer continue taking Naproxen, Flexeril and Percocet to manage her pain, that she begin taking Neurontin for her chronic lower back pain and that she attend physical therapy.  (*Id.*).  Rosenbauer declined physical therapy due to "home stressors," including her six children and her ailing husband.  (*Id.*).


## IV.    Proceedings before the ALJ

At the administrative hearing, Rosenbauer testified that she completed school through the eighth grade and had tried to obtain her GED, but could not because she had difficulty getting out of the house.  (Tr. 50).  According to Rosenbauer, she is five feet, five inches and weighs approximately 194 pounds.  (*Id.*).  She testified that she lives with her husband and six children, ages 17, 15, 13, 10, 6 and 4.  (Tr. 51).

Rosenbauer testified that she has not worked since 1999, when she was employed as a cashier at a gas station.  (Tr. 55).  Rosenbauer previously worked at a daycare as a bus aide. (*Id.*).  According to Rosenbauer, she worked in that position for approximately five months, but left her job because it required her to lift and bend to pick up children.  (Tr. 55-56).  Rosenbauer testified she also previously worked in a factory.  (*Id.*).

Rosenbauer testified that she suffers from diabetes and experiences rapid blood sugar fluctuations.  (Tr. 51).  According to Rosenbauer, when her sugar is very low she is "shaky" and when her sugar is high she is very tired.  (Tr. 51-52).  Rosenbauer testified that she has difficulty maintaining a healthy diet because of her six children and that her husband assists her in remembering to take her medications.  (*Id.*).  Rosenbauer indicated that her diabetes also causes foot pain and numbness in her hands, fingers and toes.  (Tr. 53).  She also has vision problems and possible kidney damage related to her diabetes.  (*Id.*).  Rosenbauer also experienced a callous on her left foot.  (Tr. 54).

In addition to diabetes, Rosenbauer testified that she also suffers from chronic back pain.  (*Id.*).  According to Rosenbauer, she fell when she was fourteen and has experienced back pain ever since that time.  (*Id.*).  Rosenbauer testified that when she was twenty-four, she underwent an MRI that indicated that she had "two herniated, slipped discs" in her lower back.  (*Id.*).  According to Rosenbauer, her doctors have provided treatment in the form of pain regimen and have suggested physical therapy to control her back problem.  (*Id.*).  Rosenbauer testified that her back pain makes it difficult to complete household chores and requires her to sit or complete tasks in "spurts."  (Tr. 55).  In addition, her back pain interrupts her sleep and limits her ability to go on long car rides.  (*Id.*).

According to Rosenbauer, she also has been diagnosed with sleep apnea and uses a CPAP machine every night.  (Tr. 58).  Rosenbauer testified that the CPAP machine has not improved her sleep and that she only sleeps for approximately three hours each night.  (*Id.*).  Her inability to sleep, according to Rosenbauer, causes her to take naps during the day and to feel drained and without energy.  (*Id.*).

During a typical day, Rosenbauer testified that she cares for her children and gets them prepared to attend school. (Tr. 56). She drives her two youngest children to school and picks them up later in the day. (*Id.*). Although Rosenbauer attempts to perform smaller chores around the house, she testified that her older children assist with the dishes, laundry and taking out the garbage. (*Id.*). According to Rosenbauer, she is able to lift approximately five pounds and can stand for approximately ten minutes and sit for approximately twenty minutes before needing to take a break. (Tr. 57). Rosenbauer testified that she has difficulty climbing stairs. (Tr. 59). In addition, she testified that when her back pain is acute, she uses a cane to assist with mobility. (Tr. 57).

Rosenbauer testified that she is currently taking Metformin and Lantus to control her diabetes. (*Id.*). She also takes Prozac, Oxycodone, Naproxen and Cylobenzafine. (*Id.*). According to Rosenbauer, she experiences approximately ten to fifteen migraines per month. (Tr. 57-58). She is currently taking Toradol to treat her migraines. (*Id.*). Rosenbauer testified that her medications help to alleviate some of her pain and allow her to wash more dishes or to complete the household vacuuming. (Tr. 59). According to Rosenbauer, her pain returns when the medications wear off. (*Id.*).

Rosenbauer testified that she also suffers from depression. (Tr. 60). According to Rosenbauer, she is taking Prozac to address her depression, but it causes anxiety in the evening. (Tr. 59-60). Rosenbauer testified that she is on a waiting list to receive individual therapy at Unity Health Systems to address her depression. (*Id.*). According to Rosenbauer, her depression has gotten worse and makes it difficult to complete certain daily activities. (*Id.*).

A vocational expert, James Newman ("Newman"), also testified during the hearing. (Tr. 60-65). The ALJ first asked Newman to characterize Rosenbauer's previous

employment.  (Tr. 60).  According to Newman, Rosenbauer had previously been employed as a cashier and a daycare worker.  (Tr. 60-61).

The ALJ then asked Newman whether a person of the same age as Rosenbauer, with the same education and vocational profile, who was able to complete simple, routine tasks without production rate or pace work at a light exertional level, but needed a sit/stand option and could not climb stairs would be able to perform any of the work that Rosenbauer previously performed.  (Tr. 61).  Newman opined that such an individual would be unable to perform the previously-identified positions, but would be able to perform the positions of office helper, table worker and conveyor worker.  (Tr. 61-62).

The ALJ then asked Newman whether a person of the same age as Rosenbauer, with the same education and vocational profile, who was able to complete simple, routine tasks without production rate or pace work in a low stress environment with occasional decision-making at a sedentary exertional level, but needed a sit/stand option and could not climb stairs would be able to perform any of the work that Rosenbauer previously performed.  (Tr. 62).  Newman opined that such an individual would be unable to perform the previously-identified positions.  (*Id.*).  Newman testified that such an individual could perform other jobs available in the local and national economy, including table worker, DOT number 739.687-182 with 62,000 positions in the national economy and 1,100 positions in New York State; stuffer, DOT number 731.685-014, with 80,000 positions in the national economy and 1,400 in New York State; and patcher, DOT number 723.687-010, with 35,000 positions in the national economy and 900 in New York State.  (Tr. 62-63).  Newman also testified that these jobs would not be available to the same individual if that individual was off task approximately fifteen percent of the time.  (Tr. 64).

## DISCUSSION

### I.       Standard of Review

              This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

              To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

(1)   whether the claimant is currently engaged in substantial gainful activity;

(2)   if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)   if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)   if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)   if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 16-27).  Under step one of the process, the ALJ found that Rosenbauer had not engaged in substantial gainful activity since May 19, 2010, the application date.  (Tr. 21).  At step two, the ALJ concluded that Rosenbauer has the severe impairments of insulin dependent diabetes mellitus, degenerative spondylosis at T11-12, L4-5 and L5-S1, chronic migraine headaches, obstructive sleep apnea, depression, bipolar II disorder, and panic disorder without agoraphobia.  (*Id.*).  With respect to Rosenbauer's mental impairments, the ALJ found that Rosenbauer suffered from moderate difficulties in maintaining concentration, persistence or pace and social functioning and mild difficulties in performing activities of daily living.  (*Id.*).  At step three, the ALJ determined that Rosenbauer does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 21-22).  The ALJ concluded that Rosenbauer had the RFC to perform sedentary work except that she needs the option to sit or stand at will; cannot climb stairs or perform production rate or pace work; is limited to simple, routine tasks; and, requires a low stress work environment with only occasional decision-making.  (Tr. 23).  At step four, the ALJ determined that Rosenbauer was unable to perform former work as a cashier or daycare worker.  (Tr. 25).  Finally, at step five, the ALJ concluded that Rosenbauer could perform other jobs that existed in the local and national economy, including table worker, stuffer and patcher.  (Tr. 26).  Accordingly, the ALJ found that Rosenbauer is not disabled.  (*Id.*).

**B.**     **Rosenbauer's Contentions**

Rosenbauer contends that the ALJ's determination that she is not disabled is not supported by substantial evidence.  (Docket # 18-1).  First, Rosenbauer contends that the ALJ's physical RFC assessment is not based upon substantial evidence because it relied upon the findings of Eurenius, whose opinion is too vague and conclusory to support the ALJ's findings.  (*Id.* at 11-13).  Next, Rosenbauer contends that the ALJ's assessment of her mental capabilities was flawed for two reasons.  First, she maintains that the ALJ improperly failed to apply the special technique required for evaluating mental impairments.  (*Id.* at 14-15).  Next, Rosenbauer argues that the ALJ's RFC assessment was not supported by substantial evidence because she improperly rejected Harding's opinion and thus failed to account for the limitations identified by Harding.  (*Id.* at 15-17).  Finally, Rosenbauer maintains that the ALJ's determination at step five is not supported by substantial evidence because the ALJ misstated the vocational expert's testimony concerning the number of patcher positions available in the local economy and because the vocational expert's testimony does not otherwise provide substantial evidence to support the ALJ's conclusion.  (*Id.* at 9-11, 17-18).

**II.**     **Analysis**

**A.**     **ALJ's RFC Assessments**

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d

Cir. 2010).

### 1.    Physical RFC Assessment

Rosenbauer challenges the ALJ's physical RFC determination on the grounds that

it relied upon the consultative opinion rendered by Eurenius.  (Docket # 18-1 at 11-13).

According to Rosenbauer, Eurenius's use of the phrase "moderately" to describe Rosenbauer's

limitations was too vague to permit the ALJ to formulate her RFC assessment.  (*Id.*).

"An expert's opinion can be deemed 'not substantial' when the expert describes

the claimant's impairments in terms which are 'so vague as to render it useless in evaluating'

[p]laintiff's RFC." *Mancuso v. Colvin*, 2013 WL 3324006, *3 (W.D.N.Y. 2013) (quoting

*Burgess v. Astrue*, 537 F.3d 117, 128-29 (2d Cir. 2008)).  In other words, an expert's opinion that

uses vague phrases may not constitute substantial evidence to support an RFC determination

when it is "accompanied by no additional information, [and thus] prevent[s] the ALJ, as a

layperson, from being able to make the necessary inference whether [p]laintiff can perform the

particular requirements of a specified type of work." *See id.*  Contrary to Rosenbauer's

contentions, the use of phrases such as "moderate" or "mild" by a consultative examiner does not

automatically render the opinion impermissibly vague. *See Dier v. Colvin*, 2014 WL 2931400,

*4 (W.D.N.Y. 2014) ("while the treating physician and consultative examiner used terms like

"mild" and "moderate[,]" this does not automatically render their opinions void for vagueness");

*Tudor v. Comm'r of Soc. Sec.*, 2013 WL 4500754, *12 (E.D.N.Y. 2013) ("[c]ontrary to

plaintiff's contentions, the 'mere use of the phrase 'moderate limitations' does not render [a

doctor's] opinion vague or non-substantial for purposes of the ALJ's RFC determination'")

(quoting *Mancuso v. Colvin*, 2013 WL 3324006 at *4).  Instead, when "those opinions are based

on clinical findings and an examination of the claimant, the conclusion can serve as an adequate

basis for the ALJ's ultimate conclusion."  *Dier v. Colvin*, 2014 WL 2931400 at *4 (internal

quotations omitted).

Eurenius's opinion that Rosenbauer was "moderately limited" in her ability to sit

for prolonged periods, climb or descend stairs, bend, lift, kneel or carry more than ten pounds

was based upon his review of x-rays of Rosenbauer's spine, as well as his interview and physical

examination of Rosenbauer.  (Tr. 536-41).  During the examination, Eurenius noted that

Rosenbauer was able to walk on her heels and toes, squat halfway, had a normal gait and stance,

had full flexion, extension, lateral flexion and full rotary movement in her cervical spine and had

some flexion limitations in her lumbar spine.  Accordingly, Eurenius's opinion concerning

Rosenbauer's "moderate" limitations was based upon medical examination, evaluation and

observation, and the ALJ thus properly relied upon Eurenius's opinion to support her RFC

assessment.  *See Dier*, 2014 WL 2931400 at *4 ("when, as here, [the doctor's opinions] are

based on clinical findings and an examination of the claimant, the conclusion can serve as an

adequate basis for the ALJ's ultimate conclusions) (internal quotation omitted); *Tudor v.

Comm'r of Soc. Sec.*, 2013 WL 4500754 at *12 ("[because the doctor's] opinion was supported

by 'additional information,' i.e., objective medical findings, her opinion is not vague and

provided an adequate basis for the ALJ to infer that plaintiff is capable of performing the

exertional requirements of sedentary work"); *Mancuso*, 2013 WL 3324006 at *4 ("[a]s the

challenged sentence of [the doctor's] report is based on the aforementioned observations, which were made pursuant to valid medical tests, . . . [the doctor's] opinion constitutes valid, substantial medical evidence which the ALJ properly utilized when determining [p]laintiff's mental RFC[;] [t]herefore, the ALJ's . . . RFC determination was supported by substantial evidence").  Accordingly, I conclude that the ALJ's physical RFC determination is supported by substantial evidence.

### 2.     **Mental RFC Assessment**

I turn next to Rosenbauer's contention that the ALJ's mental RFC assessment was flawed because the ALJ improperly rejected the opinion of Harding, the non-examining state consultative psychiatrist, and because the ALJ failed to apply the "special technique" at steps two and three.  (Docket # 18-1 at 14-17).

Rosenbauer contends the ALJ improperly rejected Harding's medical opinion and in doing so failed to discuss moderate limitations identified by Harding.  Specifically, Rosenbauer contends that the ALJ failed to account for her moderate limitations in her ability to accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

An ALJ should consider "all medical opinions received regarding the claimant." *See Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)).  When evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

> (1)  the frequency of examination and length, nature, and extent of the treatment relationship,
>
> (2)  the evidence in support of the physician's opinion,
>
> (3)  the consistency of the opinion with the record as a whole,

(4)  whether the opinion is from a specialist, and

(5)  whatever other factors tend to support or contradict the
     opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Spielberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House*

*v. Astrue*, 2013 WL 422058, *2 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Under the regulations, Harding is an acceptable medical source, and the opinion

should have been considered by the ALJ.  20 C.F.R. § 404.1513.  Accordingly, I agree with

Rosenbauer that the ALJ erred by rejecting Harding's opinion on the grounds that the consultant

was not an acceptable medical source.  I conclude, however, that the ALJ's error was harmless

because Harding's opinion is consistent with the ALJ's RFC assessment.  *See Amberg v. Astrue*,

2010 WL 2595218, *4 (N.D.N.Y.) ("although the ALJ's stated reason for discounting the

[doctor's] opinions may not have been supported by the record, any error in this regard was

harmless because the ALJ's RFC finding is consistent with [the] opinions") (citing *Johnson v.*

*Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("where application of the correct legal principles to

the record could lead to only one conclusion, there is no need to require agency

reconsideration")), *report and recommendation adopted*, 2010 WL 2595130 (N.D.N.Y. 2010).

As discussed above, Harding opined that Rosenbauer was moderately limited in

her ability to accept instructions and respond appropriately to criticism from supervisors,

maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness,

respond appropriately to changes in the work setting and travel to unfamiliar places.  (Tr. 67).

After assessing those moderate limitations, Harding opined that Rosenbauer could "perform

basic demands of competitive, remunerative unskilled work on a sustained basis."  (Tr. 68).  The

ALJ determined that Rosenbauer could perform simple, routine tasks without production rate or

pace work in a low stress work environment with only occasional decision-making.  Although

the ALJ may not have discussed each of the moderate limitations identified by Harding, her RFC

assessment accounted for those limitations and was entirely consistent with Harding's opinion

that Rosenbauer could perform unskilled work without any other limitations.  Accordingly, I

conclude that the ALJ properly evaluated and incorporated into her RFC assessment the

limitations identified in Harding's opinion, even if she did not explicitly discuss each limitation.

*See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ was not required to discuss

thoroughly each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate

limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting

plaintiff's moderate limitations in his ability to carry out detailed instructions and to maintain

concentration for extended periods").  Indeed, if anything, the ALJ's RFC assessment assumed

greater limitations on Rosenbauer's ability to work than Harding's opinion.[4]  Accordingly, I

conclude that although the ALJ erred in rejecting Harding's opinion, such error was harmless

because consideration of Harding's opinion would not have altered the ALJ's RFC assessment.

The Court finds no merit in Rosenbauer's argument that the ALJ erred by failing

to apply the "special technique" applicable to mental impairments.  (Docket # 18-1 at 14-15).

An ALJ's evaluation of a claimant's mental impairments must reflect her application of the

"special technique" set out in 20 C.F.R. § 404.1520a, which requires consideration of "four

broad functional areas . . . : [a]ctivities of daily living; social functioning; concentration,

---

[4]  Harding opined that Rosenbauer could perform remunerative unskilled work, which is consistent with the
ALJ's RFC that limited Rosenbauer to simple, routine tasks.  The ALJ imposed further limitations, including
requiring a low stress work environment, only occasional decision-making and no production rate or pace work.

persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). The first

three areas are rated on a five-point scale – "[n]one, mild, moderate, marked, and extreme." *Id.*

at § 404.1520a(c)(4). "[I]f the degree of limitation in each of the first three areas is rated 'mild'

or better, and no episodes of decompensation are identified, then the [ALJ] generally will

conclude that the claimant's mental impairment is not 'severe.'" *Kohler v. Astrue*, 546 F.3d 260,

266 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a(d)(1)).

   Here, the ALJ concluded that Rosenbauer suffered from mild restrictions in

activities of daily living and moderate difficulties in maintaining social functioning and

concentration, persistence or pace.[5] (Tr. 21). In addition, the ALJ concluded that Rosenbauer

had not suffered from any episodes of decompensation. (*Id.*). In support of this conclusion, the

ALJ reasoned that Rosenbauer was able to care for herself and her six children, maintain a

relationship with her husband and successfully manage her household. (Tr. 22). Although the

ALJ could have explained her reasoning more thoroughly when evaluating Rosenbauer's

abilities in each of the areas, I conclude that the ALJ adequately applied the special technique

when she concluded that Rosenbauer's depression, bipolar II disorder and panic disorder were

"severe" but did not meet any of the listings applicable to mental disorders. *Cf. Arguinzoni v.*

*Astrue*, 2009 WL 1765252, *9 (W.D.N.Y. 2009) (ALJ's failure to apply special technique did

not require remand; "[w]hile [the ALJ] failed to document specific findings as to the degree of

limitation in each functional area, the ALJ still ultimately highlighted his findings and concluded

a sufficient analysis to permit adequate review on appeal in this case").

---

[5]  Rosenbauer argues that the ALJ failed to cite and thus likely overlooked Harding's Psychiatric Review
Technique located at Exhibit 17F of the record. (Docket # 18-1 at 17). Even assuming Rosenbauer is correct, any
such error by the ALJ was harmless because her application of the "special technique" resulted in an evaluation
substantially identical to Harding's. (*Compare* Tr. 21 *with* Tr. 552).

**B.**     **ALJ's Step Five Determination**

Finally, I turn to Rosenbauer's challenges to the ALJ's step five determination. (Docket # 18-1 at 9-11, 17-18).  Rosenbauer contends that remand is warranted because the ALJ misstated the vocational expert's testimony.  Specifically, Rosenbauer contends that the ALJ stated that there were 2,900 jobs patcher jobs available in the local economy, but that Newman testified that there were only 900 patcher jobs available in the local economy.   Although Rosenbauer is correct that the ALJ misstated the number of patcher jobs identified by Newman, I conclude that her misstatement was harmless.  *Campbell v. Comm'r of Soc. Sec.*, 2002 WL 31107503, *5 n.5 (E.D. Mich. 2002) ("[t]he ALJ's misstatement of the number of suitable jobs is inconsequential").  Newman testified that Rosenbauer could perform three different jobs with a combined total of 3,400 jobs in New York.  (Tr. 62-63).  That number is sufficiently large to satisfy the Commissioner's burden at step five.  *See Gurule v. Astrue*, 2012 WL 1609691, *4 (D. Vt. 2012) ("[c]ourts have refused to draw a bright line standard for the minimum number of jobs required to show that work exists in significant numbers, and have generally held that what constitutes a significant number of jobs is a relatively low threshold number") (internal quotation omitted) (collecting cases).

Finally, Rosenbauer contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. (Docket # 18-1 at 18).  Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected.  *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

## <u>CONCLUSION</u>

This Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 10)** is **GRANTED**.  Rosenbauer's motion for judgment on the pleadings **(Docket # 18)** is **DENIED**, and Rosenbauer's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*

_____
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
       August 22, 2014